IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 15, 2022

## STATE OF TENNESSEE v. JACKIE DEAN MILLER

**Appeal from the Circuit Court for Marshall County**
**No. 19-CR-115   Forest A. Durard, Jr., Judge**

_____

### No. M2020-01393-CCA-R3-CD
_____

The Defendant, Jackie Dean Miller, was convicted by a Marshall County Circuit Court jury of aggravated burglary, a Class C felony, and two counts of theft of property valued at $10,000 or more but less than $60,000, a Class C felony. *See* T.C.A. §§ 39-14-403 (2018) (subsequently repealed, replaced by § 39-14-1003 (Supp. 2021)) (aggravated burglary), 39-14-103 (2018) (theft), 39-14-105 (2018) (subsequently amended) (grading of theft). The trial court merged the theft convictions and imposed an effective ten-year sentence to be served in the Department of Correction. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions, (2) he was denied a fair trial because jurors may have seen the Defendant in a sheriff's car, and (3) the trial court abused its discretion in imposing consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

John M. Schweri, Columbia, Tennessee, for the Appellant, Jackie Dean Miller.

Herbert H. Slatery III, Attorney General and Reporter; Scott M. Corley, Assistant Attorney General; Robert H. Carter, District Attorney General; Lee Brooks and William Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions arose from the burglary of a house and property rented or owned by the Haynes family, who no longer lived at the property but continued to lease or own it. Numerous items were discovered to be missing from the property. George Haynes IV discovered the Defendant and other people at the property, and when he

confronted them, they fled. After Mr. Haynes IV[1] provided a license plate number of the truck in which the individuals fled, law enforcement identified the perpetrators and found some of the missing items at a home where the Defendant had been staying. Lillie Jackson, one of the people who Mr. Haynes IV discovered at the property, was also charged in relation to the missing items.

At the trial, George Haynes III testified that he and his mother had lived at a home on Lunns Store Road for about nine years. He said the property also had a shop. He said that his mother died and that he moved elsewhere but continued to lease the house, where he stored the items that were later discovered missing. He identified the following missing items: collectible die-cast John Deere miniature toy vehicles in original packaging, collectively worth "several thousand dollars" because they were no longer made; 2500 to 3500 collectible die-cast Hot Wheels toy cars, many still in original packaging, which he sold at a flea market for $1 each; pocket knives, which he sold at a flea market; thirty to forty cast iron skillets; afghans made by his mother; four motorized wheelchairs; a 36′ camper, for which he had paid $5000 and for which had recently purchased new tires; toolboxes; and numerous other items.

Mr. Haynes III testified that he had experienced brain bleeds, after which he moved in with his son, Mr. Haynes IV. Mr. Haynes III said he never gave the Defendant or anyone else permission to go to the Lunns Store Road property, to take items from the property, or to sell the items. Mr. Haynes III said he had not leased the property to anyone.

Mr. Haynes III testified that he and his son compiled a list of the stolen property, which Mr. Haynes III submitted to his insurer, but his claim was denied because he did not have photographs of the items. Mr. Haynes III said he had purchased some of the items at auctions and on eBay and acknowledged he could not provide serial numbers or documents to show the purchase prices for the items.

George Haynes IV testified that the Lunns Store Road house and shop contained the personal property his father and grandmother accumulated in their lifetimes. Mr. Haynes IV said he stored his tools in the shop. He said "[t]hey throwed . . . away" his grandmother's family photographs and Bible.

Mr. Haynes IV testified that after his father retired, his father bought pocket knives on eBay and made $500 to $1000 per weekend selling them at a flea market. Mr. Haynes IV said that he purchased a large safe for the house, in which he stored "important documents." Mr. Haynes IV said Harley-Davidson motorcycle "[c]omplete bodies that had been tor[n] down for restoration" and "pretty much any kind of mechanic tool you

---

[1] Both George Haynes III and George Haynes IV testified at the trial. For clarity, we refer to them as Mr. Haynes III and Mr. Haynes IV.

want" were missing. Mr. Haynes IV identified a list of the stolen property, and the list was received as an exhibit. The claimed value of the items totaled $48,970. Mr. Haynes IV said he had been conservative in estimating the value of the property, noting that some of the Hot Wheel cars were worth hundreds of dollars each but that in order to avoid a dispute, he had estimated $1 each because they could be purchased at Walmart for this amount. He said the estimates were based upon what he and his family members had paid for the items. He acknowledged that some of the items were recovered and had been returned.

Mr. Haynes IV testified that after his father moved in with him, he went to the Lunns Store Road property often enough to maintain it and to retrieve items that he needed from the shop. He said that about two months before November 19, 2018, he began to notice that items were missing. He said that at first, small items were missing but that eventually, the camper was missing. He described the camper as a 30′ recreational vehicle that had to be pulled with a one-ton truck. He said the camper had been purchased around 2004 for $5000, that it had new tires, and that he had used it shortly before it disappeared.

Mr. Haynes IV testified that he spoke to neighbors about helping him "keep an eye out." He said that he contacted law enforcement about the missing property but that he was not satisfied with the response. He said the officer who responded would not file a report on the basis that Mr. Haynes IV did not have a vehicle identification number or a title for the camper, which Mr. Haynes IV said he had purchased from neighbors. Mr. Haynes IV said he decided to catch the perpetrators himself.

Mr. Haynes IV testified that he began driving by the property frequently. He said the perpetrators drove a Silverado truck identical to his own and posited that they "got away with it for as long as they did" due to the similarity of the trucks. He said the neighbors saw the perpetrators' truck at the property and assumed it was his truck. Mr. Haynes IV said that once he saw the truck, he recognized it as one he had seen at Ms. Jackson's parents' house.

Mr. Haynes IV testified that on November 19, 2018, he went to the property after having received a telephone call. He said that when he entered the house, he saw the Defendant. Mr. Haynes IV said that he asked the Defendant what he was doing in the house and that the Defendant pointed to the bedroom and stated, "I'm here with her." Mr. Haynes IV said that Lillie Jackson was also present and that she stated she had purchased the house from Cheaphouses.com. Mr. Haynes IV said he had not listed the property for sale. He said Ms. Jackson did not "appear to be the one in charge" and that everyone appeared to be in charge of themselves. He said that he had never seen the Defendant or Ms. Jackson before this night and that he had not given them permission to be in the house. Mr. Haynes IV said others were outside the house and estimated "there was about four of them." Mr. Haynes IV said that he called the sheriff's department and that the intruders fled in a truck. He said that he followed the intruders and remained on the call with the

sheriff's department. He said that he eventually lost sight of the intruders but that he provided the license plate number of their truck to an officer.

Mr. Haynes IV testified that he had two conversations with the Defendant at court appearances. Mr. Haynes IV said that the Defendant "blamed it on her and [stated] that she ruined his life." Mr. Haynes IV said that in a separate conversation, the Defendant stated that Ms. Jackson had given him the camper and that the Defendant traded the camper for a car.

Marshall County Sheriff's Department (MCSD) Detective Tony Nichols testified that his investigation of another matter led him to a home where some of the items missing from the Haynes Lunns Store Road house were recovered. A list of the recovered property and its estimated value was received as an exhibit. The list reflects that the estimated value of the recovered items was $6337.

Detective Nichols testified that he determined the Defendant did not own or lease the house where the recovered property was located but that the Defendant and Ms. Jackson, who were in a romantic relationship, had been staying there. He agreed that Ms. Jackson had "enter[ed] a plea" in the present case. Detective Nichols said he determined that another man and another woman lived at the house but that he did not determine the nature of their ownership interest.

Savannah Ragsdale testified that she was present at the Haynes Lunns Store Road house on November 19, 2018. She said, "It was supposed to be a house we were cleaning and turns out it was not. And then we got into a high speed chase running from the owners of the location." She said she was with the Defendant, Ms. Jackson, and a man whose name she did not know. She said that before November 19, she had been staying with the Defendant and Ms. Jackson and that she had driven them separately on unidentified dates to the Lunns Store Road house. She said that she had taken the Defendant to the Lunns Store Road house about two or three days before November 19 and that she "was told we were checking the water pumps." She said she waited in the car and did not pay attention to what the Defendant did while they were there. She said that prior to or on November 19, the Defendant never told her that he believed Ms. Jackson had purchased the Lunns Store Road property. She said the Defendant never said he and Ms. Jackson were trying to lease the property.

When asked what statements the Defendant made when they were fleeing the scene on November 19, Ms. Ragsdale testified that the Defendant said, "That he had a gun." Ms. Ragsdale said that while the truck in which they were riding during the chase was traveling at thirty to forty miles per hour, she and an unidentified man "ended up out of the vehicle," but she did not recall if she had been "pushed out intentionally or on accident." She later

agreed she might have jumped and said she remembered falling out of the truck. She said she had been injured but did not seek medical treatment.

Ms. Ragsdale testified that she had gone to the Lunns Store Road property to clean two to four times. When asked if she and the others had taken cleaning supplies with them, she said, "Sometimes, yes." She said they had taken bleach, towels, and toilet bowl cleaner. She said the Defendant had not taken supplies to repair drywall, clean up dog excrement, or to make other repairs. She said she never saw anyone take anything from the house and that the Defendant did not tell her he had taken anything. She said she had not been charged criminally.

MCSD Detective Drew Binkley testified that on November 20, 2018, the Sheriff's Department received a report that a citizen had seen two women and a man pushing a safe from a truck into a brush line. Detective Binkley said the people involved were Ms. Jackson and her parents. Detective Binkley said that after Detective Nichols investigated the discarded safe, they went to a house where he had attempted earlier in the day to locate the Defendant and Ms. Jackson relative to the present case. Detective Binkley said they obtained consent to search the house, where they discovered several items that were missing from the Haynes Lunns Store Road house. Photographs of the recovered items were received as an exhibit. Detective Binkley said that "without doing the math," the total value of the items taken was around $53,000.

Detective Binkley testified that the truck in which the Defendant, Ms. Jackson, Ms. Ragsdale, and the other man were riding was registered to Ms. Jackson or her father. Detective Binkley said Ms. Jackson's parents lived near Mr. Haynes IV's house. He agreed that Ms. Jackson "enter[ed] a plea" in this case and said Ms. Jackson's parents "enter[ed] pleas" in a case related to the safe.

The jury found the Defendant guilty of aggravated burglary and two counts of theft of property valued at $10,000 or more but less than $60,000. The trial court merged the theft convictions, which were based upon alternative modes. The trial court sentenced the Defendant, a Range I offender, to serve six years for aggravated burglary and four years for theft. The court ordered the sentences to be served consecutively based upon its finding that the Defendant's record of criminal activity was extensive. *See* T.C.A. § 40-35-114(b)(2) (2019) (subsequently amended). This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

## A. Aggravated Burglary

On the relevant date in this case, aggravated burglary was defined as "burglary of a habitation[.]" T.C.A. § 39-14-403(a) (2018) (subsequently repealed, replaced by § 39-13-1003 (Supp. 2021)). At the time, the burglary statute provided: "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft, or assault[.]" *Id*. § 39-14-402(a)(1) (2018) (subsequently repealed, replaced

by § 39-13-1002(a)(1) (Supp. 2021)). Habitation is defined as "any structure . . . designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A) (2018). Owner is "a person in lawful possession of property whether the possession is actual or constructive." *Id.* at (3). A jury is permitted to infer that a person who possesses recently stolen property obtained the property through theft, unless the possession of the property is satisfactorily explained. *State v. James*, 315 S.W.3d 440, 450 (Tenn. 2010). However, the inference that a burglary occurred is only permitted when "there exists a rational connection between possession and participation, when guilt [of burglary] more likely than not flows from possession, and importantly, when there is some other evidence corroborating the burglary that warrants the inference." *Id.* at 452; *see State v. Foust*, 482 S.W.3d 20, 54-55 (Tenn. Crim. App. 2015).

The Defendant argues that despite the State's evidence regarding the large quantity of items taken from the Haynes property, the proof only showed that he visited the house once and was not seen taking any of the items on this occasion. He argues, as well, that the State did not prove adequately that he lived at the home where some of the stolen property was found, that the State did not offer Ms. Jackson as a witness, that law enforcement did not initially file a report when Mr. Haynes IV first reported that items were missing, and that Mr. Haynes III's insurer had denied a claim for the stolen property. The Defendant's arguments invite this court to reweigh the evidence, a matter reserved exclusively for the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547.

Viewed in the light most favorable to the State, the evidence shows that on November 19, 2018, the Defendant and others entered the Haynes Lunns Store Road house without permission from Mr. Haynes III or Mr. Haynes IV. The State offered evidence that the Defendant had been to the property at least one other time. When confronted by Mr. Haynes IV on November 19, the Defendant professed to be in the house with Ms. Jackson, who falsely claimed that she had purchased the property. Both Mr. Haynes III and Mr. Haynes IV testified that they did not know the Defendant and had not given anyone permission to be on the property. Mr. Haynes IV said he had not listed the property for sale. The Defendant, Ms. Jackson, Ms. Ragsdale, and the unidentified man fled when Mr. Haynes IV called the sheriff's department, and they led Mr. Haynes IV on a high-speed chase. A jury may infer consciousness of guilt from a defendant's flight. *See, e.g.*, *State v. Berry*, 141 S.W.3d 549, 587-88 (Tenn. 2004) (appendix); *State v. Zagorski*, 701 S.W.2d 808, 813 (Tenn. 1985). The detectives determined during their investigation that the Defendant was staying with Ms. Jackson at her parents' house, where several of the stolen items were recovered. Ms. Jackson was present with the Defendant at the Haynes property on November 19, 2018. *See James*, 315 S.W.3d at 252-53. The State's theory relative to aggravated burglary was that the Defendant entered the Haynes property with the intent to commit theft.

As applied to the present case, the Defendant's presence at the scene, his flight when Mr. Haynes IV called the authorities, and the Defendant's staying with Ms. Jackson at the home where the stolen property was found are all circumstantial evidence from which a rational jury could determine that the Defendant entered the Haynes property without their permission and with the intent to commit theft. The evidence is sufficient to support the aggravated burglary conviction.

### B. Theft

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2018). Theft of property valued at $10,000 or more but less than $60,000 is a Class C felony. *Id.* § 39-14-105(a)(4) (2018) (subsequently amended).

The Defendant was convicted of two modes of theft: theft by obtaining property without the owner's permission and theft by exercising control over the property without the owner's permission. The convictions were merged. In challenging the sufficiency of the evidence to support his theft convictions, the Defendant relies on the same arguments he raised relative to the aggravated burglary conviction. In addition, he argues that the State failed to establish that the value of the property was $10,000 or more but less than $60,000. As we stated above, it is not the province of this court to reweigh the evidence. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547.

Viewed in the light most favorable to the State, the evidence shows that the Defendant went to the Haynes property at least twice, stating on one occasion that his purpose was to check on water pumps and failing to provide a reason for his presence on the other occasion, aside from stating he was present with Ms. Jackson. Mr. Haynes III and Mr. Haynes IV testified that they did not know the Defendant and that they had not given anyone permission to be on the property. Mr. Haynes III testified specifically that he had not given anyone permission to sell the missing items. The Defendant and Ms. Jackson were staying at her parents' house, where several items that were missing from the Haynes property were recovered. The Defendant fled from the Haynes property when confronted by Mr. Haynes IV, who called the sheriff's department. The Defendant's lack of a satisfactory explanation for his presence on November 19, 2018, his flight from the scene when he was confronted by Mr. Haynes IV and was in peril of apprehension by law enforcement, and his unexplained possession of recently stolen goods were evidence from which a rational jury could conclude that the Defendant obtained the property without the owners' permission and that he exercised control over the property without the owners' permission. The evidence is sufficient to support the Defendant's merged theft convictions.

-8-

With regard to the Defendant's argument that the State failed to establish the value of the property was at least $10,000, we acknowledge that the proof did not establish the precise pecuniary value of the stolen property. However, both Mr. Haynes III and Mr. Haynes IV identified specific items which were taken and their values. Several items taken had significant value, such as the camper worth $5000 and Mr. Haynes III's flea market inventory, which consisted of thousands of items with a small value individually but a collectively large value. In addition, numerous other items of significant value, such as Mr. Haynes IV's tool collection and disassembled Harley-Davidson motorcycles, were taken. Mr. Haynes IV testified that his estimated values had been conservative. From the evidence, a rational jury could conclude that the value of the stolen property was at least $10,000 but less than $60,000.

Because the evidence is sufficient to support the convictions, the Defendant is not entitled to relief on this basis.

## II

**Denial of a Fair Trial - Potential that the Defendant was Seen in a Sheriff's Car**

The Defendant contends that he was denied his right to a fair trial due to "the negligent or intentional failure of the State to shield the jurors from seeing him in the custody of the Sheriff." He also argues that the jurors may have placed undue significance on his wearing civilian clothing despite his being in custody, which he posits might have seemed "suspicious" to the jurors.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). A criminal defendant "must be afforded the 'physical indicia of innocence.'" *State v. Hall*, 461 S.W.3d 469, 497 (Tenn. 2015) (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973)) (discussing the in-court use of shackles on a defendant); *State v. Smith*, 639 S.W.2d 677, 681 (Tenn. Crim. App. 1982).

The record reflects that at the end of the first day of the trial, the trial court addressed two sheriff's officers, stating, "[S]omebody brought [the Defendant] up [to the courthouse] in a marked unit, that is not to happen tomorrow at all." The court expressed its frustration that the jail administrator had allowed this to occur. The court proposed to designate a member of the jury panel who may have seen the Defendant in the marked car to be an alternate juror, and defense counsel agreed to the plan.

Defense counsel did not raise the issue in the motion for a new trial, but at the hearing on the motion, the Defendant stated that "everybody in the jury" saw him getting

out of a sheriff's vehicle "[b]oth days in a row." The Defendant said he wanted the trial court to consider the issue. The court permitted the defense to amend the motion for a new trial to include the issue, and the court reserved its ruling until it could conduct a second hearing, specific to this issue.

At the second hearing, MCSD corrections officer Kolton Sharp testified that he had transported the Defendant to court on the first day of the trial. He said the Defendant had been in plain clothes, seated in the back of a marked sheriff's car. He did not recall if the Defendant had been handcuffed but said the Defendant had not been shackled. Officer Sharp said that he arrived "after – probably 7:45" and that he had parked "at the backside over here." He did not recall having seen anyone other than the prosecutor but acknowledged he had not looked for people seated inside cars. Officer Sharp said he and Deputy Levi had a conversation with the prosecutor, in which he informed the prosecutor that no unmarked car had been available to transport the Defendant to court and that Officer Sharp had been instructed by his superior officers to transport the Defendant in a marked car. Officer Sharp thought he transported the Defendant back to the jail in an unmarked sheriff's car at the end of the first day of the trial. Officer Sharp did not recall if he had seen any cars or people in the parking lot when he took the Defendant back to the jail.

Officer Sharp testified that on the morning of the second day of the trial, he brought the Defendant to court in an unmarked car. He said he arrived earlier than 7:45 a.m., as he had been instructed to do. Officer Sharp said he came to the courthouse early in order to avoid the possibility of the Defendant being seen by members of the public. He denied that he had parked in front of the courthouse, rather than at the side, and he denied that the Defendant had reminded him to park elsewhere. He said the Defendant was in plain clothes and seated in the backseat. Officer Sharp did not recall where he had parked or if he had seen other cars or people. He said that when he was ready to transport the Defendant back to the jail after the second day of the trial, he had to have the unmarked sheriff's car jump-started. He said that the car used to jump-start his car was not a marked sheriff's car and that this took place on the side of the courthouse. He agreed that the jump-start situation occurred after the trial was over and that the court officer ultimately took the Defendant to the jail.

When asked if it was possible that people entering the courthouse on the two days of the trial had seen the Defendant coming from a marked sheriff's car, Officer Sharp said, "I do not know[.]" Officer Sharp agreed that on both days of the trial, he had not parked in the designated parking space for officers to use when transporting inmates between the jail and the courthouse and that he had parked in an area that could not be seen from the main entrance. He agreed that, at the prosecutor's direction, he had taken the Defendant into the courthouse through a side door, that this was not the main courthouse entrance, and that deputies had taken the Defendant up a back staircase to wait in the grand jury room. Officer Sharp agreed that members of the public would not have seen the Defendant

entering the courthouse in this manner. Officer Sharp agreed that he had been in plain clothes when transporting the Defendant. Officer Sharp agreed that he followed the customary practice of waiting for the courthouse and the parking lot to clear at the end of the day before transporting the Defendant to the jail.

The Defendant testified that on the first day of the trial, the sheriff's department had taken him from the jail to the courthouse late, which he thought was because the car would not start. He said that he arrived in the backseat of the car, that he was dressed in plain clothes, and that he was not in handcuffs. He said the officer parked "at the side where the Sheriff's [sic] park at the last parking spot." He said two or three women and a man walked in front of a car as he was being taken out of the backseat and that he was "pretty sure" they saw him. He said he later recognized the people in the jury pool. He said that one of them ultimately became an alternate juror and that the others were not selected. He said that he spoke to the bailiff about the people seeing him and that the bailiff "was mad about it." He agreed that he was brought into the courthouse through a side door that was not the main entrance and that he was taken up a back stairwell into the grand jury room. He agreed that Officer Sharp was told to have the Defendant at the courthouse earlier the next morning. The Defendant said a juror may have seen him go out the front entrance of the courthouse and that the bailiff had him and Officer Sharp wait in a room until the juror was out of the courthouse. The Defendant said he was taken to the jail at the end of the first day of the trial in a marked sheriff's car. He said the car had to be jump-started in the courthouse parking lot at the end of the first day. He disagreed that this had happened the second day and recalled that it had been a car, not the SUV in which he rode the second day.

The Defendant testified that on the second day of the trial, he was taken to the courthouse in an unmarked sheriff's SUV. He said that Officer Sharp first parked "out front where the van parks" and that Officer Sharp moved when the Defendant noted a juror parked "right behind" the SUV. The Defendant said the juror had already been in the parking spot when he arrived. He said this juror was not one of the people who walked in front of the car the previous day. He said that at the end of the second day of the trial, the bailiff took him to the jail. He did not think "anyone" saw him leave on the second day.

In the order denying the motion for a new trial, the trial court found that no jurors were questioned about whether they had seen the Defendant in the custody of the sheriff and that no curative instruction had been requested. The court found that the Defendant was in plain clothes, that he was not shackled or handcuffed, and that the evidence "is not clear whether the Defendant was seen by a prospective juror," and that the Defendant had offered no evidence to show that he had been prejudiced by the events which transpired.

The Defendant's preliminary statement of the issue asks, "Whether the Court erred in not declaring a mistrial due to jurors seeing the Appellant in custody?" However, in his

argument section, he states the issue was one involving the denial of a fair trial and asks for a new trial. His argument does not address whether the court erred in not granting a mistrial. The State argues that the Defendant has waived consideration of the mistrial issue because he failed to object to the issue during the trial and agreed to the trial court's proposed remedy of having the male juror who may have seen him serve as the alternate juror. Based upon the record before us, no motion for a mistrial was raised during the trial, and the Defendant first requested relief for the possibility that the jurors had seen him in the motion for a new trial. To the extent that the Defendant's brief may be interpreted as assigning error to the fact that no mistrial was granted, the issue is waived. *See* T.R.A.P. 36(a); *State v. Christopher Scott Montella*, No. M2020-00016-CCA-R3-CD, 2022 WL 1040126, at *11 (Tenn. Crim. App. Apr. 7, 2022) ("[A] mistrial cannot be granted after the jury verdict has been accepted by the trial court."); *State v. Justin Antonio McDowell*, No. E2020-01641-CCA-R3-CD, 2022 WL 1115577, at *17 (Tenn. Crim. App. Apr. 14, 2022); (stating that when a claim that a mistrial should have been granted is first raised in the motion for a new trial, the issue is waived, and review is limited to one for plain error). Because the Defendant also raised the issue as one of a constitutional deprivation requiring a new trial, we will consider whether the trial court erred in denying the motion for a new trial on this basis. *See Christopher Scott Montella*, 2022 WL 1040126, at *11.

The Defendant also raises, for the first time on appeal, an argument that his being dressed in plain clothes despite being in the custody of the sheriff might appear "suspicious" to the jurors. He has not explained the nature of the suspicion he contends might arise from these facts. Issues raised for the first time on appeal are waived. T.R.A.P. 36(a); *State v. Turner*, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995).

Thus, our consideration is limited to the question of whether the Defendant was denied a fair trial based upon the possibility that a juror or jurors may have seen him in the sheriff's custody. In *State v. Tandy Tomlin*, No. M2019-00274-CCA-R3-CD, 2021 WL 1388112, at * 14-15 (Tenn. Crim. App. Apr. 13, 2021), the defendant argued that he was denied a fair trial because the jury was present when he was brought into the courtroom through a security door by a uniformed officer. The trial court found that the jurors "had no reason to know" the defendant had come from the holding area and that numerous other officers were present for security purposes. *Tandy Tomlin*, 2021 WL 1388112, at *14. The trial court found that the defendant had not shown prejudice. A panel of this court concluded that the trial court had not abused its discretion in denying relief. *Id.* at *15.

In *State v. Jeffery E. Long*, No. E2007-00754-CCA-R3-CD, 2008 WL 2743600, at *4-5 (Tenn. Crim. App. July 14, 2008), *perm. app. denied* (Tenn. Jan. 20, 2009), the defendant argued that he was entitled to a new trial "because potential jurors might have seen him in the physical custody of the police when he was being placed in a holding cell inside the courthouse." An officer testified that ten people whom he assumed were prospective jurors could have seen him taking the defendant to a holding cell. *Jeffrey E.*

-12-

*Long*, 2008 WL 2743600, at *4. The officer said the defendant had been dressed in plain clothes and had not been in "visible shackles or physical restraints." *Id.* The officer testified that the door to the holding cell looked like a normal door and that anyone who saw the defendant go through the door "would not have necessarily known" it was a holding cell door. *Id.* at *4. In affirming the trial court's denial of the motion for a new trial on this issue, a panel of this court noted the lack of evidence that any juror had been "tainted because he or she saw the defendant in custody." *Id.* at *5

The trial court found that the Defendant did not establish whether or not he was seen by a juror and that he failed to show that he had been prejudiced by the events which transpired. The record supports the court's determinations in this regard. Further, the record reflects that the court provided a remedy for the possibility that a juror had seen the Defendant by offering to designate the juror as the alternate juror, and the defense agreed at the time that this was an acceptable remedy. Because the Defendant failed to show that he was denied a fair trial, he is not entitled to relief on this basis.

## III

## Sentencing

The Defendant contends that the trial court erred in ordering him to serve his sentences consecutively. He argues that an effective ten-year sentence is not justly deserved in relation to the offenses.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

An abuse of discretion with a presumption of reasonableness standard applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the

evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the only evidence the trial court received was the presentence report. It reflects that the thirty-four-year-old Defendant dropped out of high school in the tenth grade, had not been employed for the past two years but had been caring for and living with his father, and had never paid the court-ordered child support for three of his four children. The Defendant advised the presentence report preparer that he believed Ms. Jackson had purchased the Haynes house with an inheritance she received and that he had been going to the house to help clean it. The Defendant reported fair mental health and poor physical health. His Strong-R Risk Assessment ranked him as a "moderate" risk to reoffend. His history of criminal convictions included numerous misdemeanor convictions and several probation revocations, beginning at age twenty-one and continuing until the present offenses.

The trial court found that the Defendant had seventeen prior misdemeanor convictions and an additional Alabama second degree assault conviction. The court found that consecutive sentencing was appropriate on the basis that the Defendant had an extensive history of criminal activity. *See* T.C.A. § 40-35-115(b)(2). The court noted, as well, that the overall length of the sentence must be no greater than deserved for the offenses and the least severe measure necessary. *See id.* § 40-35-103(2), (4); *Desirey*, 909 S.W.2d at 33. The court found that an effective ten-year sentence was appropriate and that it had taken this into account in determining the length of the individual sentences and in imposing consecutive sentencing. The court noted that with respect to the length of the theft sentence that four years was "not even halfway up the range" but that it was nevertheless appropriate because an overall ten-year sentence was likewise appropriate.

The Defendant argues that the overall sentence is greater than deserved and that it is "unjustifiably disparate" in view of sentencing statistics published for aggravated burglary sentences by the Administrative Office of the Courts. The Defendant does not argue that the court erred in applying the enhancement factors. The record reflects that the trial court engaged in a thoughtful and thorough analysis of the relevant considerations and the facts of the case. The court made findings regarding the enhancement and mitigating factors for the individual sentences, and it noted its fashioning the length of the individual sentences in order to impose an effective ten-year sentence on the basis that this overall length was no greater than deserved and the least severe measure necessary. The court based its consecutive sentencing determination upon a finding that the Defendant had an extensive history of criminal convictions, a finding the Defendant does not challenge on

appeal. Upon review, we conclude that the Defendant has not demonstrated the trial court erred in imposing consecutive sentencing and an effective ten-year sentence. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE